2005 WY 160

**In the Matter of the WORKER'S COMPENSATION CLAIM OF Daniel DECKER, Appellant (Petitioner),**

v.

**STATE of Wyoming, ex rel., WYOMING MEDICAL COMMISSION; and Wyoming Workers' Safety and Compensation Division, Appellees (Respondents).**

No. 05-38.

Supreme Court of Wyoming.

Dec. 15, 2005.

**688**

Bill G. Hibbler, Cheyenne, Wyoming, for Appellant.

Patrick J. Crank, Wyoming Attorney General; John W. Renneisen, Deputy Attorney General; Steven R. Czoschke, Senior Assistant Attorney General; Kristi M. Radosevich, Assistant Attorney General, for Appellee.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, JJ., and JAMES, D.J.

GOLDEN, Justice.

[¶ 1] Daniel Decker alleges that he suffers from a condition that causes him upper body pain and that his employment as a sheet metal worker with Mountain Aire Heating and Air aggravated his condition. The Wyoming Workers' Compensation Division (Division) denied Decker's claim for benefits, and Decker objected. After a contested case hearing, the Medical Commission Hearing Panel upheld the denial of Decker's claim on the grounds that Decker did not prove that he suffers from thoracic outlet syndrome or that his symptoms are otherwise related to his employment. Decker appealed to the district court, which affirmed the Medical Commission's decision. Decker now appeals to this Court. This Court finds that the Medical Commission's order denying benefits is facially insufficient to permit review. We therefore reverse the district court's decision and remand with directions to vacate the order denying benefits.

## ISSUES

[¶ 2] Decker presents two issues:

I.  Whether the Medical Commission order is supported by substantial evidence?

II. Whether the Medical Commission order is contrary to law?

The Division presents the following single statement of the issue:

A claimant applying for workers' compensation benefits must prove that each additional claim is related to their employment injury. The Medical Commission Hearing Panel determined that Decker's medical complaints of thoracic outlet syndrome

were not related to a compensable work injury, which was diagnosed and reported as bilateral wrist tendinitis. Is the Medical Commission Hearing Panel's decision denying benefits supported by substantial evidence?

## FACTS

[¶ 3] Decker began working as a sheet metal worker approximately one year out of high school. He worked for Powder River Heating for six and a half years, and then in October 2000 he began working for Mountain Aire in Gillette, Wyoming. Decker's duties for Mountain Aire were similar to his duties with his former employer, except in his employment with Mountain Aire he did not have an assistant working with him and he worked more overtime. His duties included fabrication, assembly, and installation of ductwork. In the fabrication and assembly processes, Decker's work was performed primarily at waist level. During installation of the ductwork, 95% of Decker's work was overhead requiring him to work eight hours out of a ten-hour day with his hands over his head.

[¶ 4] On August 27, 2001, Decker was pulling a piece of tin out from under a bench and felt his wrist pop. Shortly thereafter while snipping the corners of another piece of tin, Decker's other wrist popped and began to feel sore. From Decker's reported date of injury to the date of his hearing before the Medical Commission, Decker was examined and/or treated by at least nine physicians and one psychologist, including two independent medical examiners. We set forth below a fairly detailed account of the medical evidence presented to the Medical Commission, both to outline the varying medical opinions and to provide a backdrop for the necessary findings of fact we find missing from the Medical Commission's decision.

[¶ 5] On August 27, 2001, the same day on which he experienced the onset of pain in his wrists, Decker sought medical care from Dr. Paul Johnson. Dr. Johnson noted his impression that Decker suffered from bilateral wrist tendinitis, prescribed a wrist splint for his right wrist along with physical therapy, and instructed him to avoid grasping and using his grip for extended periods of time.

Dr. Johnson made an entry in his notes for that visit that he would see Decker again in one month and "[i]f he is still having significant symptoms, and if it acts more neurologic, would then do an EMG study."

[¶ 6] On August 28, 2001, Decker signed his worker's compensation injury report, describing his injury as tendinitis in both wrists. The Division received the report on August 31, 2001.

[¶ 7] On September 17, 2001, Decker again saw Dr. Johnson. Dr. Johnson made the following note concerning that visit:

> 27–year–old male here for recheck of his bilateral hand pain. He has been going to physical therapy, notes that he is a little bit better, however, he has some areas that are a little more pronounced in discomfort. Describes pain radiating back to the elbow. Notes some thumb discomfort. He has pain that goes into the middle finger bilaterally. His left wrist feels worse than the right. He notes that on some days he will have very little pain and discomfort and then on other days he will have a significant amount of paresthesia and pain to the wrist area and fingers. Notes that he is dropping objects. He has a hard time with grip strength. Notes occasional lateral elbow discomfort. Denies neck pain or shoulder pain.

Following the September 17, 2001, exam, Dr. Johnson noted his impression that Decker suffers from bilateral wrist pain, "[s]uspicious for carpal tunnel syndrome." He referred him for an EMG study bilaterally and instructed him to "[c]ontinue with work modification, decreased usage of his hands, ice, physical therapy modalities."

[¶ 8] On October 11, 2001, Decker had a third appointment with Dr. Johnson. Dr. Johnson noted the following concerning Decker's condition:

> He has bilateral wrist and hand pain with paresthesias. States lately he has been getting more symptoms of paresthesias. Notes when he takes days off and doesn't work he does pretty well however on days that he begins working it doesn't take very long for him to begin having the paresthesias, pain and weakness. Denies elbow or

shoulder pain. Notes discomfort in all aspects of his hands, pain with flexion/extension.

Dr. Johnson discussed with Decker the results of his EMG test which were normal. Dr. Johnson's overall impression of Decker's condition on that visit was "[h]and paresthesias and weakness." Following the October 11, 2001 visit, Dr. Johnson referred Decker to Dr. Mark Simonson for an evaluation of his paresthesias.

[¶ 9] Decker saw Dr. Simonson on October 31, 2001. Dr. Simonson described Decker as presenting "an unusual case of bilateral hand parasthesias, migrating bilateral upper extremity pain, sense of discontrol, and an unusual exam." He went on to note:

He could have some component of radial tunnel syndrome, though his electrodiagnostic study adequately evaluated this possibility and was normal.

He may have some component of thoracic outlet syndrome, noting irritability here, with his forward shoulders and tightness throughout the shoulder girdles. Perhaps he has some degree of underlying cervical stenosis.

\* \* \* \*

I am recommending his physical therapist give some attention to the thoracic outlet including biomechanics and postural education.

[¶ 10] On November 15, 2001, Decker returned to Dr. Simonson for a follow-up visit. Decker reported to Dr. Simonson that his overall pain on that date was "not near as bad and has improved a lot." Dr. Simonson also made the following note:

Today, he tells me that he gets exhausted by midday. He tells me that it continually feels like his T-shirt is too tight and he is always pulling on it. He has a sense of fullness in his neck and feels like he is not getting enough blood to his head. He feels borderline dizzy at times.

\* \* \* \*

This continues to appear as a thoracic outlet problem, at least in part. There may be both neurologic as well as vascular components to this. Regarding the latter and his complaints of a sense of fullness and

poor circulation to his head and such, I recommend vascular consultation, with Dr. Schabauer.

[¶ 11] On December 11, 2001, Decker saw Dr. Schabauer. According to Decker's testimony, Dr. Schabauer's initial examination and testing lasted about one and a half hours. Following that initial examination, Dr. Schabauer diagnosed Decker with thoracic outlet syndrome. His notes concerning his assessment provide:

Thoracic outlet syndrome. Supportive through noninvasive testing just completed at the clinic, as well as physical examination. Have recommended that he continue with physical therapy, and over the next 6 months, if he does not see improvement, could then move onto other considerations. In the interim, he should also lose weight. This would also help him in symptom relief. . . . Interestingly, it seems with Mr. Decker that he has a component of nerve as well as venous and arterial impingement present.

[¶ 12] In his deposition testimony in this case, Dr. Schabauer testified that wrist aching, along with whole arm aching, a degree of numbness and heaviness of the arm are symptoms associated with thoracic outlet syndrome. He also testified that the physiology of thoracic outlet syndrome is congenital and he could not say that Decker's work caused the condition. He testified further that in his opinion, "based upon a reasonable degree of medical probability and/or certainty," Decker's overhead work as a sheet metal worker aggravated his thoracic outlet syndrome.

[¶ 13] Decker was next referred by Dr. Simonson to Dr. Stephen Annest, a vascular surgeon. On February 19, 2002, Decker saw Dr. Annest. Dr. Annest diagnosed Decker with brachial plexus impingements, noting:

His present complaints are consistent with brachial plexus impingements with pain in the shoulder, radiating into the arm and hand with numbness and tingling of the ulnar two fingers and thumb. He has a sensation of clumsiness. Overhead actions worsen his symptoms.

By letter dated March 29, 2002, Dr. Annest provided his opinion that Decker's complaints "are work related complaints which resulted from his work as a sheet metal worker for Mountain Air Heating Company."[1]

[¶ 14] Decker again saw Dr. Annest on May 7, 2002, still reporting neck, shoulder and arm pain. Dr. Annest noted that Decker "continues to have symptoms consistent with a diagnosis of brachial plexus entrapment bilaterally," and he referred Decker to Dr. Robert Wright at Denver Pain Management for an interscalene block. Dr. Wright performed the interscalene block on May 10, 2002, and noted following the procedure: "The patient tolerated the procedure well and experienced excellent relief of pain in his right upper extremity. Given the low volume injectate used, this result is consistent with and supports a diagnosis of thoracic outlet syndrome." Decker reported that the relief of his symptoms following the treatment was only short term.

[¶ 15] On July 17, 2002, at the Division's direction, Decker saw Dr. Bruce Lockwood for an independent medical examination. Dr. Lockwood included the following comments in his notes after examining Decker:

I feel that in all likelihood his intermittent parascapular and cervical pain complaints are myogenic in origin. This plays a part in what would appear to be myogenic brachial plexus irritation at the thoracic outlet.... I do feel that his symptoms and with the lack of nonorganic dysfunction on exam in all likelihood are produced by myogenic thoracic outlet dysfunction.
* * * *
I feel that there are multiple factors that play a part into why he is having most likely a myogenic thoracic outlet syndrome. These include most importantly probably his posture, body mechanics and genetics and his overall systemic condition. Other factors or possible aggravators may

have been utilization of the activator and activities both inside and outside of work which usually are [at] or above chest level and are repetitive in nature. I do not feel that a primary injury occurred at work, but do feel that it is reasonable and probable that work activities, as well as activities outside of work aggravated his overall condition, but did not cause his condition.
* * * *
I do not feel that his history nor his documentation indicates a work-related injury. The contention is that there was a work-related aggravation. While I feel that his work activities in all likelihood within a probability play a part in his myofascial dysfunction, there are multiple factors and more pressing factors outside of work that I have discussed above that are playing a part in his presentation. I also discussed with him my concerns that he feels that he was wrongfully terminated or laid off work. He became somewhat agitated in discussing this which indicates there may be actually a significant psychologic component or secondary gain issue playing a part in his presentation. If this continues to persist, a psychologic evaluation could help clarify this.

[¶ 16] On May 28, 2003, Decker saw another physician, Dr. Charles Brantigan, a vascular and thoracic surgeon. Dr. Brantigan noted the following after his physical examination of Decker:

My recommendation is that he see a rheumatologist.[2] The history of joint pains is not compatible with thoracic outlet syndrome. I have also suggested that he needs to have a CT of the thoracic outlet using our protocol.
The problem that we face is that he has no health insurance at the present time. Workmen's Compensation is denying his claim. From my standpoint, it sounds like a repetitive motion injury of some type,

---

1. In his deposition testimony, Dr. Schabauer explained that thoracic outlet syndrome and brachial plexus impingement are different conditions in that thoracic outlet syndrome involves arterial, vascular and nerve impingement, while brachial plexus impingement is only nerve impingement. He also noted, though, that the terms are commonly used interchangeably.

2. On December 4, 2003, Decker saw Dr. Anne MacGuire for an examination to evaluate whether he suffers from arthritis. Dr. MacGuire did not provide an opinion concerning what might be causing Decker's symptoms, but she did rule out arthritis.

and absent some other explanation, I am inclined to attribute that to his work.

[¶ 17] On October 9, 2003, at the Division's direction, Decker saw Dr. Joel L. Cohen, a psychologist. Dr. Cohen concluded that Decker was not a good candidate for surgical intervention based in part on his following observations:

He is scheduled for a legal hearing in early 2004 and is hoping to find some resolve in his situation. His concerns are financial because he has had to pay most of the recent medical treatment and as a result has accrued a substantial debt, which [he] is struggling to manage. Given that, one has to consider the possibility (whether conscious or unconscious) of secondary gain issues.

At the time of our meeting, the patient was not reporting a substantive injury related emotional and psychological distress. He acknowledged a longstanding history of episodic depression.... He described himself as often internalizing emotional distress and I have no doubt that this is a factor that has contributed to the longstanding history of ill health. To the extent that we can assume his internalized emotional distress contributed to previous illness as well as a reported history of some colitis-like symptoms it is also clear that we can assume internalized distress is an active factor in his current symptom complaints.

[¶ 18] The last physician Decker saw before his contested case hearing was Dr. Gerald Moress, a neurologist. At the Division's request, Decker saw Dr. Moress on January 16, 2004, for another independent medical examination. Dr. Moress stated that he did not "find any psychological implications" for Decker's problem. His notes also stated:

1. I am unable to diagnose thoracic outlet syndrome either related to occupational exposure or any other causation. His finding of decreased radial pulse with certain provocative measures is found so commonly in the normal population that the testing is unreliable. There is no gold standard for making the diagnosis of thoracic outlet syndrome. The condition is over diagnosed and unfortunately over treated. He has aching in both hands and elbows with a bizarre sensory finding of decreased perception to pinprick over both palms. This is clearly nonphysiologic. There is no evidence of any vascular compromise in the upper extremities. The motor examination is entirely normal....

2. I agree with Dr. Lockwood that there was not any specific injury that occurred at work that caused his symptomology. He developed nonspecific soft tissue muscle ligamentous problems in the upper extremities related to his work....

* * * *

6. It would be reasonable that his original diagnoses had been wrist tendonitis and it certainly would have improved when he had discontinued his work. There is no implication for TOS.

* * * *

9. Mr. Decker's current medical condition is nonspecific discomfort of the forearms and hands associated with a nonphysiologic sensory change. There would be no pre-existing condition related to his current complaints.

[¶ 19] Following the contested case hearing during which the Medical Commission was provided medical reports, Dr. Schabauer's deposition testimony, and Decker's testimony, the Medical Commission issued its order which contained thirteen findings of fact. The first twelve findings of fact appear to be findings of basic fact, or a recitation of some of the evidence presented to the Commission. Paragraph 13 of the findings of fact appears to contain the Commission's findings of ultimate fact. It provides:

The Panel finds the initial injury reported of wrist tendinitis was likely accurate. He was engaged in physical activities which resulted in a "popping" in his wrists followed by pain. While seeing Dr. Johnson, pressure or movements of the wrist caused pain. If Mr. Decker was suffering from thoracic outlet syndrome, palpation or movement of the wrists would have no effect on his condition. Wrist tendinitis does not cause thoracic outlet syndrome. After being prescribed wrist splints by Dr. Johnson, Mr. Decker testified his condition progressively became worse and his symp-

toms moved up his arm. Wrist splints do not cause thoracic outlet syndrome no[r] would they have any effect one way or the other on such a condition. Mr. Decker continued to follow up with Dr. Johnson for several months and noted no elbow, upper arm or shoulder problems. Diffuse pain and numbness throughout the arms would be seen with thoracic outlet syndrome. During this time period Mr. Decker was off work and then was working far less hours and light duty. This would have helped symptoms of thoracic outlet syndrome and not caused them to increase. It is unusual to have someone work light duty and have thoracic outlet syndrome symptoms get worse. Mr. Decker worked in the same type of job for years without any symptoms. There is no medical explanation as why such a claimed condition would suddenly begin and continue to get worse.[FN]

FN The only possible explanation could be an increase in weight which has nothing to do with an occupational injury.

From Mr. Decker's testimony and the records, the history of how these symptoms developed does not fit the normal presentation of thoracic outlet syndrome.

Physical findings of thoracic outlet syndrome such as reduced blood flow occur in nonsymptomatic persons. Further, the various doctors who have examined Mr. Decker report inconsistent physical findings. Most of these doctors, other than the independent examining physicians, did not have the opportunity to review the prior medical records and how the symptoms developed. Further, there are normal EMG studies, generally normal vascular findings, and normal radiographic studies. Also significant, Mr. Decker reports joint pain in his wrists, elbows, and shoulders. Complaints of joint pain as opposed to diffuse pain, is not consistent with thoracic outlet syndrome. Based on the evidence submitted, the Panel cannot conclude that Mr. Decker has thoracic outlet syndrome. Further based on the evidence, the Panel cannot find whether the symptoms being experienced by Mr. Decker relate to his work effort on behalf of the Employer.

[¶ 20] Based on these findings, the Medical Commission held in its final conclusion of law that "Mr. Decker has not met his burden of proof that he has thoracic outlet syndrome. Further, he has not met his burden of proof that whatever may be the cause of his symptoms that such is related to his employment."

## STANDARD OF REVIEW

[¶ 21] A worker's compensation claimant has the burden of proving every essential element of his claim by a preponderance of the evidence. *Cramer v. State ex rel. Wyoming Workers' Safety and Comp. Div.*, 2005 WY 124, ¶ 8, 120 P.3d 668, 670 (Wyo.2005). "Under the statutory definition of injury, he must prove that his injury arose out of and in the course of his employment. Whether an employee's injury occurred in the course of his employment is a question of fact." *Id.*

[¶ 22] When reviewing an administrative agency order, we review the case as if it came directly from the administrative agency, affording no deference to the district court's decision. *Hicks v. State ex rel. Wyoming Workers' Safety and Comp. Div.*, 2005 WY 11, ¶ 16, 105 P.3d 462, 469 (Wyo.2005). The scope of our review is governed by Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2005), which provides:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

[¶ 23] In appeals where both parties to a contested case submit evidence, appellate review of the evidence is limited to application of the substantial evidence test. *Berg v. State ex rel. Wyoming Workers' Safety and Comp. Div.*, 2005 WY 23, ¶ 7, 106 P.3d 867, 870 (Wyo.2005); *Newman v. State ex rel. Wyoming Workers' Safety and Comp. Div.*, 2002 WY 91, ¶ 22, 49 P.3d 163, 171 (Wyo.2002). We review the entire record and apply the substantial evidence test as follows:

> In reviewing findings of fact, we examine the entire record to determine whether there is substantial evidence to support an agency's findings. If the agency's decision is supported by substantial evidence, we cannot properly substitute our judgment for that of the agency and must uphold the findings on appeal. Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. It is more than a scintilla of evidence.

*Cramer*, ¶ 10, 120 P.3d at 671.

[¶ 24] Even if sufficient evidence supports the administrative decision under the substantial evidence test, *Newman* requires that this Court apply the arbitrary-and-capricious standard as a "safety net" to catch other agency action that may have violated the Wyoming Administrative Procedures Act. *Loomer v. State ex rel. Wyoming Workers' Safety and Comp. Div.*, 2004 WY 47, ¶ 15, 88 P.3d 1036, 1041 (Wyo.2004). "Under the umbrella of arbitrary and capricious actions would fall potential mistakes

such as inconsistent or incomplete findings of fact or any violation of due process." *Padilla v. State ex rel. Wyoming Workers' Safety and Comp. Div.*, 2004 WY 10, ¶ 6, 84 P.3d 960, 962 (Wyo.2004).

## DISCUSSION

[¶ 25] Decker argues the Medical Commission's decision should be reversed both because it is unsupported by substantial evidence and because it is contrary to law. Because we find that the Medical Commission's findings of fact fail to provide this Court a rational basis for judicial review, we do not address Decker's substantial evidence arguments. We agree with Decker that the Commission's findings of ultimate fact, in particular those found in Paragraph 13 of its findings, appear to represent the Commission's personal impressions and opinion concerning Decker's condition rather than the required weighing of the relevant evidence presented to the Commission. We will address first the deficiencies in the Medical Commission's findings of fact, and then, to provide guidance on remand, we will briefly address Decker's other contentions that the Medical Commission decision is contrary to law.

*Findings of Fact*

[¶ 26] The Medical Commission was created in 1993 to serve a number of functions, including to provide three-member panels to hear medically contested workers' compensation claims. Wyo. Stat. Ann. § 27-14-616(b)(iv) (LexisNexis 2005). When hearing a medically contested case, the panel serves as the hearing examiner with jurisdiction to make the final determination concerning the contested claim. *Id.* Hearings before Medical Commission panels are to be conducted in accordance with the Wyoming Administrative Procedure Act. *See Himes v. Petro Engineering & Construction*, 2003 WY 5, ¶ 19, 61 P.3d 393, 399 (Wyo.2003). The Wyoming Administrative Procedure Act requires that "[f]indings of fact shall be based exclusively on the evidence and matters officially noticed." Wyo. Stat. Ann. § 16-3-107(r) (LexisNexis 2005). It also requires that an agency's final decision "include find-

ings of fact and conclusions of law separately stated." Wyo. Stat. Ann. § 16–3–110 (Lexis-Nexis 2005).

[¶ 27]   We have interpreted § 16–3–110 to require more than a mere recitation of evidence or ultimate conclusions:

> Our rule is that this statutory provision demands findings of basic facts upon all material issues in the proceeding and upon which the ultimate findings of fact or conclusions are based. *FMC v. Lane*, 773 P.2d 163 (Wyo.1989).   In *Cook v. Zoning Board of Adjustment for the City of Laramie*, 776 P.2d 181, 185 (Wyo.1989), we stated:

>> "It is insufficient for an administrative agency to state only an ultimate fact or conclusion, but each ultimate fact or conclusion must be thoroughly explained in order for a court to determine upon what basis each ultimate fact or conclusion was reached.   The court must know the why." *Geraud v. Schrader*, 531 P.2d 872, 879 (Wyo.), *cert. denied sub nom. Wind River Indian Education Association, Inc. v. Ward*, 423 U.S. 904, 96 S.Ct. 205, 46 L.Ed.2d 134 (1975).

> *Mekss v. Wyoming Girls' School, State of Wyo.*, 813 P.2d 185, 201–02 (Wyo.1991), *cert. denied*, 502 U.S. 1032, 112 S.Ct. 872, 116 L.Ed.2d 777 (1992).

*Himes*, ¶ 19, 61 P.3d at 399.   We recently reiterated this same approach, holding that a hearing examiner must

> make findings of basic facts upon all of the material issues in the proceeding and upon which its ultimate findings of fact or conclusions are based.   Unless that is done there is no rational basis for judicial review.
>
> * * * *
>
> All of the material evidence offered by the parties must be carefully weighed by the agency as the trier of the facts; conflicts in the evidence must be resolved, and the underlying or basic facts which prompt the ultimate conclusion on issues of fact drawn by the agency in sustaining the prima facie case made, or in rejecting it for the reason it has been satisfactorily met or rebutted by coun-

tervailing evidence, must be sufficiently set forth in the decision rendered.

*Bush v. State ex rel. Wyoming Workers' Safety and Comp. Div.*, 2005 WY 120, ¶ 9, 120 P.3d 176, 180 (Wyo.2005) (quoting *Pan Am. Petroleum Corp. v. Wyoming Oil and Gas Conservation Comm'n*, 446 P.2d 550, 555, 557 (Wyo.1968)).

[¶ 28]   In this case, the order contains no indication the Medical Commission considered and weighed all material evidence offered by the parties.   The Commission concluded that Decker's original diagnosis of bilateral wrist tendinitis was probably correct, and that he did not prove he suffered from thoracic outlet syndrome or that his upper extremity symptoms arose out of his employment.   The Commission did not, however, explain how it weighed the conflicting medical opinions to reach these conclusions.

[¶ 29]   The Commission's conclusion that the diagnosis of bilateral wrist tendinitis was probably correct illustrates our concern. The original diagnosis of wrist tendinitis was made by Dr. Johnson, but Dr. Johnson did not hold to that diagnosis.   Within a short time, he explored other explanations for Decker's symptoms and eventually referred him for a second opinion.   The only physician that opined that bilateral wrist tendinitis was the correct diagnosis was Dr. Moress.   The Commission did not explain why it found Dr. Moress' opinion to be more persuasive or credible than any of the numerous other opinions in the record.   Likewise, only Dr. Moress definitively ruled out thoracic outlet syndrome as the cause of Decker's symptoms.   Dr. Moress did not see Decker until 2004, over two years after the onset of Decker's symptoms, and Decker testified that Dr. Moress examined him for only ten minutes. The Commission may have an adequate explanation for accepting Dr. Moress' opinion and rejecting the numerous other medical opinions, but it has not provided an explanation and we therefore have no way of reviewing its decision.

[¶ 30]   The Medical Commission was presented with numerous medical opinions, most providing that Decker suffers from thoracic outlet syndrome or something similar, that his condition is congenital, and that his work

aggravated his condition. The Medical Commission decision is devoid of any weighing of these varying opinions. The closest the Medical Commission came to weighing the medical evidence was in the second paragraph of its finding of fact number 13, where it stated concerns with inconsistent physical findings reported to the physicians and incomplete medical histories provided to all but the independent examining physicians. This observation is insufficient, however, to allow meaningful judicial review. It does not specify the inconsistent physical findings or the gaps in history the Commission found material. Without that specificity, this Court cannot evaluate the reasonableness of the Commission's assertions or its reliance on Dr. Moress' opinion.

[¶ 31] Instead of weighing the medical opinions and other evidence, the Medical Commission appears to have independently diagnosed Decker based on symptoms reported by Decker and described in his medical records. Our concern that this was the Commission's approach is furthered by certain questions panel members asked Decker during the contested case hearing. For example:

Q. And when you first saw Dr. Johnson and he examined you, he writes that your wrists were tender to palpation; is that correct, when he would grasp them or pinch them in some way?

Q. Or if you moved your wrists in a particular direction, up or down or sideways, that it was also tender when he would do that?

Q. Now you currently state that you have continued numbness, and I guess that's in your hand or in your arms?

Q. Now can you just put your hands up and show me on each hand where it bothers you?

Q. Do you have pain on motion of your wrists currently?

Q. When it popped, was it just a pop or did you feel any tingling in your hand at the time?

Q. Now, did you feel that pop on the back of your wrist or on the—the inside part, the palm side of your wrist?

Q. . . . Did you ever feel a tight feeling around your arms or did you experience— tight feeling around your arms, around your neck, did you have any headaches during the time when you were felt to have thoracic outlet?

[¶ 32] We do not take issue with the Commission asking these types of questions if the responses assist them in some way in evaluating the evidence in the record. Our concern is that the Commission, instead of weighing the medical evidence presented by the parties, used the information elicited in response to these questions to diagnose Decker. The following findings illustrate our concern. They do not reference any of the medical opinions presented to the Commission, and our review of the record found no medical opinions supporting them.

"While seeing Dr. Johnson, pressure or movements of the wrist caused pain. If Mr. Decker was suffering from thoracic outlet syndrome, palpation or movement of the wrists would have no effect on his condition."

"After being prescribed wrist splints by Dr. Johnson, Mr. Decker testified his condition progressively became worse and his symptoms moved up his arm. Wrist splints do not cause thoracic outlet syndrome no[r] would they have any effect one way or the other on such a condition."

"From Mr. Decker's testimony and the records, the history of how these symptoms developed does not fit the normal presentation of thoracic outlet syndrome."

[¶ 33] This Court recognizes the expertise the Medical Commission brings to medically contested cases and the value of the Commission's expertise in honing in on the critical evidence. "The creation of the Medical Commission reflects the legislature's recognition that many contested claims involve complex medical issues, and in some cases, those issues are dispositive. Thus, each medical hearing panel will have at least one physician, and all will be health care providers with the expertise to determine the medical issues before them." *French v. Amax Coal West*, 960 P.2d 1023, 1030 (Wyo. 1998). We have, however, also held that the Medical Commission's role, as fact finder,

requires it to determine the weight to be given medical opinion testimony. *Hurley v. PDQ Transport, Inc.*, 6 P.3d 134, 138 (Wyo. 2000). As with any hearing examiner, the Commission is charged with weighing the evidence and determining the credibility of witnesses.

"When presented with medical opinion testimony, the hearing examiner, as the trier of fact, is responsible for determining relevancy, assigning probative value, and ascribing the relevant weight to be given to the testimony." ... "In weighing the medical opinion testimony, the fact finder considers: (1) the opinion; (2) the reasons, if any, given for it; (3) the strength of it; and (4) the qualifications and credibility of the witness or witnesses expressing it."

*Baxter v. Sinclair Oil Corp.*, 2004 WY 138, ¶ 9, 100 P.3d 427, 431 (Wyo.2004) (quoting *Bando v. Clure Bros. Furniture*, 980 P.2d 323, 329–30 (Wyo.1999)).

[¶ 34] As the hearing examiner in medically contested cases, the Medical Commission is tasked with weighing the medical and other evidence presented to it by the parties. It is not tasked with providing the equivalent of an independent medical examination and opinion. To allow a Medical Commission decision to rest on the medical opinions of a panel's members rather than on a weighing of the opinions submitted as evidence would be contrary to the Wyoming Administrative Procedure Act. As this Court observed in *Devous v. Wyoming State Bd. of Medical Examiners*, 845 P.2d 408, 418 (Wyo.1993):

If judicial review has any purpose, it must be exercised by objectively evaluating evidence in the record. There is no way that a judicial review could reach the subjective determination of standards by individual members of the Board. Consequently, in order to maintain the integrity of judicial review, we conclude it is necessary that, with respect to the violations that were asserted ..., expert testimony in the record was required and, lacking such testimony, there is no substantial evidence to sustain those allegations.

In this case, the record does contain medical opinion evidence. What is missing is the Commission's weighing of those opinions, and without that weighing, this Court has no basis for reviewing the reasonableness of the Commission's decision.

[¶ 35] In its brief, the Division points to much evidence in the record which it argues supports the Medical Commission's decision in this case. We reject the Division's arguments. The weighing of evidence to which the Division contends we must defer simply was not done by the Commission, and on appeal is not the appropriate time to weigh evidence.

Appellate briefing is not the place to articulate sufficient findings of fact. It is not the duty of this court to analyze and assess evidence presented to an administrative body to determine the weight to be given evidence or the credibility to be afforded witnesses.

*Bush*, ¶ 11, 120 P.3d at 180 (quoting *Billings v. Wyoming Bd. of Outfitters and Guides*, 2001 WY 81, ¶ 19, 30 P.3d 557, 567 (Wyo. 2001)).

[¶ 36] Because the Medical Commission's order fails to make findings that adequately explain the rationale for the Commission's decision, that order must be vacated.

If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.

*Bush*, ¶ 12, 120 P.3d at 181 (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985)). We therefore remand this matter to the Medical Commission for findings of supplemental facts and the entry of a new, more complete order either granting or denying benefits.

*Burden of Proof*

[¶ 37] In a footnote to Paragraph 7 of its Conclusions of Law, the Medical Commission stated:

> The Panel considered this issue under the standard burden of proof. In all likelihood, it should be considered under the stricter burden of proof under W.S. § 27–14–603(a) for claims based on injuries that occur over a substantial period of time. Mr. Decker has not met his burden under either standard.

Decker argues the Medical Commission acted contrary to law in citing one standard as the correct standard and then applying a different standard. We agree, although we attribute much of the confusion to Decker's arguments before the Commission. Decker argues on appeal that the evidence he presented to the Commission was that he sustained an aggravation of his condition over a period of time. On the other hand, Decker's counsel argued to the Commission:

> [N]owhere in the Division's disclosure statement or in the Division's final determination of January 22, 2002 is the issue that Wyoming Statute 27–14–603 is applicable to this case. So I would simply submit that that is not an issue in this case at this point in time.

[¶ 38] On appeal, Decker states that the Medical Commission "recognized that the position being advanced by Mr. Decker was that he sustained the aggravation over a substantial period of time." Because Decker has settled on this position, the Commission's revised order should analyze Decker's claim under the heightened burden of proof required by Wyo. Stat. Ann. § 27–14–603 (LexisNexis 2005).

[¶ 39] Decker also argues on appeal that it "is immaterial whether he actually suffered from TOS, and if so, whether it was caused by his employment or was congenital." With this we cannot agree. Although the diagnosis attached to the condition may not be as important, whether the condition is congenital or was caused by Decker's employment is an important distinction. If it is Decker's position, as it seems to be in most of his argument, that his condition is congeni-

tal, that means it is a preexisting condition. A preexisting condition is not a compensable injury unless the injured employee proves that his employment *materially* aggravated his condition. *Boyce v. State ex rel. Wyoming Workers' Safety and Comp. Div.*, 2005 WY 9, ¶ 11, 105 P.3d 451, 455 (Wyo.2005); *Frontier Refining, Inc. v. Payne*, 2001 WY 49, ¶ 8, 23 P.3d 38, 40 (Wyo.2001).

[¶ 40] On remand then, the Medical Commission must determine whether Decker has proven that his work materially aggravated his congenital condition. To guide the Commission's determination, we reiterate our recent observations concerning the type of evidence required to prove a material aggravation.

> The causal connection between the work and the condition is satisfied if the medical expert testifies it is more probable than not that the work contributed in a material fashion to the aggravation of the injury. Expert medical testimony to the effect that the work "contributed to" the injury or that the injury "most likely" or "probably" is the product of the workplace suffices. We can find no authority for the proposition that the medical expert must state with specificity that the work conditions "materially or substantially" aggravated the preexisting condition. Nor can we find authority requiring the medical expert to apportion the aggravation between work conditions and other possible contributing factors. In fact, Larson opines, except by exceptional statute in a few states, of which Wyoming is not one, "the relative contribution of the accident and the prior disease is not weighed...."
>
> * * * *
>
> These cases make clear that our case law requiring a claimant to show his or her employment "materially or substantially aggravated" the preexisting injury does not require expert medical testimony specifically using the words "substantial or material." Rather, what our cases require is that the claimant show that work activities, rather than the natural progression of the condition, factors associated with ordinary daily living or some other non-work related factor, significantly aggravated the

preexisting condition. The nexus between work activities and the aggravation ordinarily will be shown through expert opinion testimony. That is, expert medical testimony ordinarily will be required to establish the link between the worsening of the medical condition and the claimant's work activities, rather than some other factor. The materiality of the nexus ordinarily will be shown through evidence of the facts and circumstances surrounding the employment. Stated simply, the claimant is required to prove by a preponderance of all of the evidence that the work activities were a significant factor in the worsening of the preexisting condition.

*Boyce,* ¶¶ 11, 16, 105 P.3d at 455, 456 (citations omitted).

*Second Compensable Injury*

■ [¶ 41] We agree with Decker that the second compensable injury rule is not at issue in this matter. Decker has not contended that bilateral wrist tendinitis or his wearing of a wrist splint for that originally diagnosed condition caused his thoracic outlet syndrome. His argument, as presented to the Commission and on appeal, is that "the wrist pain presentation was nothing more than a symptom of the thoracic outlet syndrome." Decker argues that the injury for which he filed the August 27, 2001, injury report was the thoracic outlet syndrome. The Medical Commission must determine, after weighing the evidence, whether that is in fact the case, but because Decker is not claiming a new or different injury from his original injury, the second compensable injury rule does not apply and Decker was not required to file a new injury report.

## CONCLUSION

[¶ 42] We hereby reverse the order of the district court and remand this case to the district court with directions to vacate the order denying benefits. Further, the district court is to remand the case for supplemental findings of fact or other proceedings consistent with this opinion.