2007 WY 46

**Darrell–Ann WALTON, Appellant (Petitioner/Employee– Claimant),**

v.

**STATE of Wyoming, ex rel., WYOMING WORKERS' SAFETY AND COMPENSATION DIVISION, Appellee (Respondent/Objector–Defendant).**

No. 05–289.

Supreme Court of Wyoming.

March 16, 2007.

Representing Appellant: Gregory L. Winn of Schilling & Winn, P.C., Laramie, Wyoming.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; John W. Renneisen, Deputy Attorney General; Steven Czoschke, Senior Assistant Attorney General; Kristi M. Radosevich, Assistant Attorney General.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, BURKE, JJ.

GOLDEN, Justice.

[¶ 1] Darrell–Ann Walton was injured in a work-related accident in 2002. She claims

she injured primarily her low back, left shoulder and neck in the accident. The Wyoming Workers' Compensation Division (Division) denied all claims submitted by Walton for injuries to her left shoulder and neck, determining that such injuries were not causally related to her work accident. Walton also submitted a claim for medication for migraine headaches, which was denied on the basis that her migraines were not causally related to the work accident. The Division paid claims relating to Walton's low back injury until October 2004. The Division denied further claims, determining that Walton's physical condition with regard to her low back had reached pre-injury status.

[¶ 2] Upon Walton's request for a hearing on the denial of her various claims, the Division referred the case to the Medical Commission. After a contested case hearing, the Medical Commission Hearing Panel upheld the Division's denial of benefits in all respects. Walton sought review from the district court, arguing the decision denying benefits was not supported by substantial evidence and was arbitrary and capricious. The district court affirmed the Medical Commission's final order in all respects. Walton presents the same arguments on appeal. We affirm the final decision denying benefits for her injuries to her neck and left shoulder as well as the denial of payment for medication for migraine headaches. We reverse the denial of benefits for injuries to Walton's low back.

## ISSUES

[¶ 3] Walton presents two issues for our review:

1. Whether the conclusion of the Medical Commission Hearing Panel that the Appellant failed to meet her burden of proof establishing that the injuries to her neck, shoulder, lower back, and her headaches were directly and causally the result of her employment related accident at Memorial Hospital of Carbon County on October 2, 2002[is] supported by substantial evidence.
2. Whether the conclusion of the Medical Commission Hearing Panel that Appellant's injuries to her neck, shoulder, lower back, and her headaches were directly and

causally the result of her employment related accident at Memorial Hospital of Carbon County on October 2, 2002[is] arbitrary and capricious as that standard is applied as a "safety net" under *Newman*.

The Division restates the issues, adding a bit more context:

1. The Medical Commission Hearing Panel determined that Ms. Walton's low back injury resolved by October 12, 2004, following her October 2, 2002 work injury. Further, the Medical Commission determined Ms. Walton failed to prove the relatedness between her work injury and complaints regarding her neck, left shoulder and headaches. Does substantial evidence support the Medical Commission Hearing Panel's decision denying benefits?
2. Whether the Medical Commission's decision denying benefits is arbitrary or capricious?

## FACTS

[¶ 4] On October 2, 2002, Walton was working as an emergency room admissions clerk at Memorial Hospital of Carbon County when she slipped and fell in a hallway of the hospital. In her initial injury report, completed by Walton the same day, she stated that she had twisted her back and had suffered injury to her right ankle, right knee, right elbow, left buttock and left hip. Immediately after the fall she was taken to the hospital's emergency room. The emergency room notes reflect the same complaints, namely stiffness and soreness in her right leg, knee and ankle, but her major complaint of pain in the emergency room was regarding her left hip area.

[¶ 5] Walton visited her family physician, Dr. Charles Young, regarding her injuries for the first time on November 14, 2002. On this first visit Dr. Young's notes reflect that Walton complained of injury to her back, left hip, right elbow and right arm. Walton regularly returned to Dr. Young with complaints of low back pain from November 2002 onward. Upon submission of the claim, the Division determined that medical payments for injuries to Walton's "left back, right arm—elbow, right foot, feet, toe(s), or an-

kle(s), right leg—knee, and left hip" were compensable. Walton received extensive treatment on her low back from several different physicians. In October 2004, the Division ceased paying benefits for treatment to Walton's low back, determining that Walton's low back had reached pre-injury status.

[¶ 6] Dr. Young first noted complaints of pain by Walton in her left shoulder on November 25, 2003. The first notation concerning complaints of pain in her neck and migraine headaches appears in March 2004. Upon submission of the new claim in March 2004, the Division denied benefits for medical treatment to Walton's neck and left shoulder on the basis that there was no compelling evidence directly relating the treatment to injuries sustained in the work accident. The Division also denied a claim for payment for migraine headache prescription medication, again finding no causal relationship between the migraine headaches and the original work accident.

[¶ 7] Walton requested a contested case hearing on all denials. The case was referred to the Medical Commission. After a full hearing, the Medical Commission Hearing Panel agreed with the Division's contentions and upheld the denial of benefits in all respects. Walton sought review from the district court, which affirmed the Medical Panel's decision. This appeal ensued.

## DISCUSSION

### Standard of Review

[¶ 8] When reviewing an administrative agency order, we review the case as if it came directly from the administrative agency, affording no deference to the district court's decision. *Hicks v. State ex rel. Wyoming Workers' Safety and Comp. Div.*, 2005 WY 11, ¶ 16, 105 P.3d 462, 469 (Wyo.2005). The scope of our review is governed by Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2005), which provides:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency

action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

[¶ 9] In appeals where both parties to a contested case submit evidence, appellate review of the evidence is limited to application of the substantial evidence test. *Berg v. State ex rel. Wyoming Workers' Safety and Comp. Div.*, 2005 WY 23, ¶ 7, 106 P.3d 867, 870 (Wyo.2005) (citing *Newman v. State ex rel. Wyoming Workers' Safety and Comp. Div.*, 2002 WY 91, ¶ 22, 49 P.3d 163, 171 (Wyo.2002)). We review the entire record and apply the substantial evidence test as follows:

In reviewing findings of fact, we examine the entire record to determine whether there is substantial evidence to support an agency's findings. If the agency's decision is supported by substantial evidence, we cannot properly substitute our judgment for that of the agency and must uphold the findings on appeal. Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. It is more than a scintilla of evidence.

*Cramer v. State ex rel. Wyoming Workers' Safety and Comp. Div.,* 2005 WY 124, ¶ 10, 120 P.3d 668, 671 (Wyo.2005).

■ [¶ 10] Even if sufficient evidence supports the administrative decision under the substantial evidence test, *Newman* requires that this Court apply the arbitrary-and-capricious standard as a "safety net" to catch other agency action that may have violated the Wyoming Administrative Procedures Act. *Loomer v. State ex rel. Wyoming Workers' Safety and Comp. Div.,* 2004 WY 47, ¶ 15, 88 P.3d 1036, 1041 (Wyo.2004). "Under the umbrella of arbitrary and capricious actions would fall potential mistakes such as inconsistent or incomplete findings of fact or any violation of due process." *Rodgers v. State ex rel. Wyoming Workers' Safety and Comp. Div.,* 2006 WY 65, ¶ 19, 135 P.3d 568, 575 (Wyo.2006); *Padilla v. State ex rel. Wyoming Workers' Safety and Comp. Div.,* 2004 WY 10, ¶ 6, 84 P.3d 960, 962 (Wyo.2004).

### Payment for Migraine Medication

[¶ 11] On appeal Walton makes no specific argument supporting the compensability of the treatment for her migraine headaches. We therefore decline to review the matter. The decision of the Medical Commission denying payment for Walton's medication for migraine headaches is summarily affirmed.

### Low Back

■ [¶ 12] The Division initially found the injury to Walton's low back compensable and paid benefits for treatment to her low back for approximately two years. The Division then decided that Walton's low back had reached pre-injury status and denied further benefits. In upholding the denial of benefits, the Medical Commission simply stated that Walton had "likely sustained a soft tissue injury to her low back" but that her condition had resolved to baseline "as reflected in the various medical records and reports." The Medical Commission provides no further information specifying exactly what medical records or reports it is relying upon in reaching this conclusion. There is no indication from the Medical Commission as to what it believes Walton's pre-injury status was, why it believes Walton's injury was only a soft-tissue injury, or when it believes Walton's condition returned to pre-injury status. In other words, there are no basic findings of fact supporting the ultimate finding. Given the content of the Medical Commission's order, this Court is unable to adequately review the ultimate conclusion of the Medical Commission.

[¶ 13] Although we would normally remand the case to the Medical Commission Review Panel for further findings, the record is clear that no evidence supports a finding that Walton's low back reached pre-injury status at any time before the hearing. The Medical Commission's conclusion to the contrary is arbitrary and capricious.

[¶ 14] It was initially Walton's burden to prove that her low back condition never returned to baseline and consequently her current complaints are related to her work accident. Walton testified that, before the accident, her low back was pain free. Dr. Young corroborated this information. Walton testified that she has experienced low back pain consistently since the accident. The medical records amply demonstrate continuous treatment for complaints of low back pain. No treating physician ever has indicated that Walton's low back had returned to pre-injury status. We fail to find any evidence that Walton's low back was pain free for any significant period from the time of the accident to the time of the hearing.

[¶ 15] In its brief, the Division points out what it characterizes as a gap in treatment for low back pain at the beginning of 2003 and argues the gap suggests Walton's low back pain resolved towards the end of January 2003. This conclusion seems to have been initially suggested by Dr. Terry Allen Brown in February 2004. The Division had requested an opinion from Dr. Brown as to whether Walton's neck and shoulder injuries were attributable to the work accident. Dr. Brown conducted a record review of Walton's medical records in formulating his opinion. He never examined Walton personally.

[¶ 16] Dr. Brown did not testify at the hearing. Instead, the Division introduced into evidence a letter written by Dr. Brown

addressed to the Division outlining his opinion. Despite only being asked about the causation of Walton's neck and shoulder injuries, Dr. Brown suggested that Walton's low back pain resolved in a timely fashion. His only comments supporting this opinion were:

> What is somewhat disturbing on review of this case is the duration of the complaints. It is noted that there is note by the chiropractor on 1/30/03 that she "was feeling pretty good" that day. This would coincide with the last physical therapy note of 1/27/03 at which point she was 0 on the 0–10 pain scale and discharged from care.
>
> She was not seen by the chiropractor again until 4/2/03 complaining of low back pain and pain in the left hip with no explanation as to why there was such a gap of time or why she was apparently much better previously and now was worse, again given the fact that she had a sedentary occupation.

[¶ 17] We do not feel this opinion justifies a finding that Walton's low back had returned to its baseline at the end of January 2003. First, the opinion was unsolicited. Dr. Brown's focus was on other complaints. Even the Division seems not to have paid too much attention to the impromptu remarks since it did not deny claims associated with Walton's low back injury until October 2004, after Walton's IME. Second, the opinion was based solely upon a record review. No valid conclusion can be drawn by the absence in medical records of a reason why Walton did not visit her chiropractor for approximately two months or what severity of pain she may have been experiencing in the interim. It is pure speculation to impute any pertinent information from the absence of notations in the various medical records.

[¶ 18] Further, the opinion to some extent misstates the record evidence. For instance, the January 2003 physical therapy discharge note indicates that Walton was pain free when standing. The note also indicates, however, that Walton suffered pain with forward flexion. Although she was released from official physical therapy sessions, she was to continue to do physical therapy exercises at home and continue to use a TENS machine.

[¶ 19] Finally, and most critically, Walton saw Dr. Young on March 5, 2003. During this early March visit, Dr. Young noted that Walton was still doing physical therapy and using the TENS unit. Dr. Young's medical records reflect that Dr. Young prescribed pain medications and muscle relaxants for Walton on this occasion. Dr. Brown seems to have discounted this visit and focused solely on the chiropractic treatment sessions in arriving at his opinion that there was a gap in treatment.

[¶ 20] Dr. Young expanded on his notes from the March 5 visit in a deposition taken several months after Dr. Brown conducted his paper review. Dr. Young testified that Walton was experiencing discomfort when she visited him in early March 2003. At that visit Dr. Young continued her on the pain and muscle relaxant medications he had previously prescribed and supplemented those medications with a prescription for darvocet, an additional pain medication.

[¶ 21] Given the state of the record, substantial evidence does not support a finding that Walton's low back was pain free for any significant period of time, if indeed at all, at the end of January or through February 2003. Our review of the rest of the record reveals no significant gap in complaints or treatment that would support a finding that Walton's low back returned to pre-injury status.

[¶ 22] The only other evidence in the record the Division seemed to rely upon in denying further claims by Walton for her low back injury is the IME report from Dr. Moress. Dr. Moress' report, however, does not support the denial of Walton's claim. Indeed, Dr. Moress verified that Walton does have a medical condition that merits continued benefits.

[¶ 23] In his report, Dr. Moress opined:

> Ms. Walton is a very emotionally disturbed individual who has pain over her entire body, excluding her left ear. She is extremely depressed and on the verge of suicide and certainly meets the criteria for a somatoform pain disorder. It would take the wisdom of Solomon to ferret out one specific area of her totality of body com-

plaints and then state this is what the industrial accident caused. Because [of] the somatoform pain disorder, I am unable to state that she has either neck or low back pain related to the original industrial injury.

Dr. Moress' treatment recommendations included:

Ms. Walton needs psychological professional counseling and ongoing medication for her depression. Whether this is a liability of the industrial accident is unknown. A psychological evaluation should be a liability of the industrial accident and would help to determine the psychosocial dynamics of her total body pain presentation, treatment, and any relationship to the industrial accident.

[¶ 24] As can be seen, Dr. Moress never suggests that Walton's low back had ever returned to baseline. Indeed, far from being pain free, Walton was in extreme discomfort when Dr. Moress examined her. Given her then current condition, Dr. Moress could not discern whether the neck and low back pain Walton was suffering was related to the work accident. In other words, Dr. Moress noted that Walton was suffering from low back pain, but had no opinion as to the causation of such pain.

[¶ 25] Dr. Moress' diagnosis was somatoform pain disorder. This diagnosis does not necessarily mean that there is nothing physically wrong with Walton. "Somatoform disorder is a relatively new term for what many people used to refer to as psychosomatic disorder." Mark H. Beers et al., *Merck Manual of Medical Information* 601 (2d Home ed.2003).

When people have persistent pain with evidence of psychologic disturbances and without evidence of a disorder that could cause the pain, the pain may be described as psychogenic. Pain that is purely psychogenic is rare. More commonly, the pain has a physical cause, but the doctor's assessment indicates that the degree of pain and the disability experienced are out of proportion to what most people with a similar disorder experience. Sometimes this type of pain is described as a chronic pain syndrome. Psychologic factors often contribute to disability and to an exaggeration of pain complaints. Any kind of pain can be complicated by psychologic factors. Even when pain is suspected to be psychogenic, doctors still investigate whether a physical disorder is contributing to the pain.

The fact that the pain is caused or worsened by psychologic factors does not mean that it is not real. Most people who report pain are really experiencing it, even if a physical cause cannot be identified. Pain complicated by psychologic factors still requires treatment, often by a team that includes a psychologist or psychiatrist.

*Id.*, at 449–50.

[¶ 26] Dr. Moress expressed that the way to find out what was happening was for Walton to undergo a psychological evaluation. Dr. Moress specifically states that the Division should be responsible for paying for the evaluation. Dr. Moress' opinion thus is that, at least for the time being, Walton continues to have a legitimate claim. He simply suggested a new course of action to better determine the nature and extent of Walton's physical injuries and whether her current symptoms are related to the work accident. In sum, Dr. Moress' opinion is relevant with regard to the continuing care and treatment of Walton. It does not support an immediate denial of benefits for Walton's low back pain.

### Neck and Left Shoulder

■ [¶ 27] The Medical Commission found Walton's injuries to her neck and left shoulder to be unrelated to her work accident:

It is clear to the Panel that following the work related fall Ms. Walton did not make any reports of any injury to her head, neck, upper back, either shoulder, or her left arm, for months following the accident. Had she sustained any injury it would be reasonable and expected that she would have made some report to one of the many doctors she saw in the first several months following the accident. Upon initially seeing Dr. Young, she expressed no such complaints and in fact no x-rays of her neck or

shoulder were requested for over a year. Several of the notes reflect a problem with the right elbow as opposed to the left. Physical therapy records reflect no complaints with her head, neck, upper back, shoulders or arms. In short, there is nothing to indicate there was ever any injury to her shoulders, neck, left arm or head as a result of the fall.

Although we would prefer clearer findings of basic fact, these findings generally are supported by substantial record evidence.

[¶ 28] The Medical Commission was incorrect in its final statement: "there is nothing to indicate there was ever any injury to her shoulders, neck, left arm or head as a result of the fall." Walton, of course, put on evidence supporting her position that she injured her left shoulder, neck and head in the fall. Indeed, on this issue Walton essentially faults the Medical Commission for not accepting her version of events. Generally, Walton claims she fell on her left side, jamming her left shoulder, hitting her head, and momentarily losing consciousness. Though she quickly regained consciousness, she doesn't remember filling out the injury report or being examined in the emergency room. She testified that she remembers telling every doctor she saw thereafter about neck and left shoulder pain as well as low back pain. She cannot explain why they did not write those complaints down, but she theorizes that she and the doctors considered the pain mainly a symptom caused by muscle spasms in her low back and therefore the sole focus was on injury to her low back.

[¶ 29] Parts of Walton's story were corroborated by two separate witnesses. At the time of the accident Walton was walking with a co-worker who corroborated Walton's description of the fall. The co-worker testified that Walton fell on her left side, hitting first her hip, then her left elbow and then her head. The co-worker believed that Walton temporarily lost consciousness because Walton hit her head hard enough for her to hear it hit the floor and immediately after the fall Walton's eyes were closed. When Walton opened her eyes Walton "seemed really out of it" and "didn't seem herself at all."

[¶ 30] In his deposition Dr. Young corroborates that he remembers Walton complaining of neck and shoulder pain at the first visit and consistently thereafter. He testified that his failure to note the same was simply an oversight on his part because he was primarily focusing on the low back pain.

[¶ 31] The Medical Commission failed to make any explicit findings of credibility as to this particular testimony of Walton, the co-worker, and Dr. Young, which is normally mandatory. The corroborating testimony, however, does not help Walton as much as it first appears. While the co-worker agreed that Walton fell on her left side, the co-worker also testified that by the time Walton reached the emergency room after the fall she thought that Walton was no longer confused and instead "was really aware of what had happened." Dr. Young's testimony is internally inconsistent. Dr. Young's note from Walton's first visit states that Walton "hurt her back, left hip and right elbow and arm." Thus, Dr. Young did note problems other than just the low back. Not included is any note of neck or left shoulder pain. In fact, Dr. Young did not note a complaint of left shoulder pain until November 25, 2003. He did not note a complaint of neck pain until March 4, 2004.

[¶ 32] Walton's testimony also is problematic. Walton testified that she thinks she must have temporarily lost consciousness because she does not remember the fall and she had a horrible headache. She remembers walking and then being on the floor, with her co-worker and one other hospital employee looking over her. Walton does remember how she felt after the fall. She did not want to get up or have anyone touch her immediately because of the severe pain she was experiencing. According to her testimony: "I remember having severe pain in my left elbow and I felt like I had jammed my shoulder out of joint and was afraid I—that's why I didn't want to move. I was afraid I had broken something."

[¶ 33] Inconsistent with this testimony is the fact that, despite being left-handed, she was able to hand-write the information on the initial injury report. She did not list a headache or left shoulder pain on the injury

report, nor do the emergency room records contain any indication of a headache or left shoulder pain. No imaging studies were done of her left shoulder or neck at the time of the accident, or indeed until over a year after the accident.

[¶ 34] Walton testified she cannot vouch for the accuracy of the injury report or the emergency room records because she did not remember participating in either. Her co-worker who walked her back to the emergency room, however, testified that Walton was alert and coherent by the time Walton filled out the injury report. The emergency room records also note that Walton was alert.

[¶ 35] The Medical Commission should have expressly ruled on its credibility determinations and findings on the evidence Walton presented. Even without this, however, there is substantial evidence to support the Commission's determination. The record unambiguously reflects that neither the initial injury report nor the emergency room records indicate an injury to Walton's left shoulder or neck. Dr. Young's notes reflect that Walton did not complain of left shoulder or neck pain until November 2003. Although an X-ray and an MRI were conducted on Walton's low back in November 2002, no imaging studies were undertaken of Walton's left shoulder until December 2003 or her neck until July 2004. When Walton first began physical therapy in January 2003, the intake notes mentioned only low back pain. There was no mention of any complaint of pain in the neck or left shoulder at any point throughout the initial physical therapy sessions (approximately eight sessions).

[¶ 36] Further, two of the doctors treating Walton for her neck and left shoulder complaints both testified that if her diagnosed injuries were caused by the work accident they would expect symptoms to appear shortly thereafter. One doctor testified that he would expect Walton to experience pain within a couple of months. The other doctor testified that he would expect Walton to experience pain and have trouble performing day-to-day activities immediately after the fall. From this evidence, we find that the Medical Commission's upholding of the denial of the claims for neck and left shoulder

injury is supported by substantial evidence and is not otherwise arbitrary or capricious.

[¶ 37] We must note one additional matter. During the course of the hearing, one of the doctors on the Medical Commission hearing panel conducted his own, brief "neurological examination" of Walton, explaining that he is "one who likes to get the information directly." He had Walton move her neck and describe the resultant symptoms. We cannot overemphasize the appropriate function of the Medical Commission:

> As the hearing examiner in medically contested cases, the Medical Commission is tasked with weighing the medical and other evidence presented to it by the parties. *It is not tasked with providing the equivalent of an independent medical examination and opinion.*

*Decker v. State ex rel. Wyoming Medical Comm'n,* 2005 WY 160, ¶ 34, 124 P.3d 686, 697 (Wyo.2005) (emphasis added). Respect for this strictly defined role is vital:

> If judicial review has any purpose, it must be exercised by objectively evaluating evidence in the record. There is no way that a judicial review could reach the subjective determination of standards by individual members of the Board. Consequently, in order to maintain the integrity of judicial review, we conclude it is necessary that, with respect to the violations that were asserted . . ., expert testimony in the record was required and, lacking such testimony, there is no substantial evidence to sustain those allegations.

*Devous v. Wyoming State Bd. of Medical Examiners,* 845 P.2d 408, 418 (Wyo.1993); *see also Rodgers,* ¶ 41, 135 P.3d at 582 (the Medical Commission hearing panel's findings of fact must be derived from the record, not personal knowledge or expertise). To the extent the doctor on the panel at this hearing was attempting to diagnose Walton, the doctor's actions were improper. Because we see no indication that the hearing panel was influenced by this "neurological exam," under the specific circumstances of this case, the improper action did not result in reversible error. We take this opportunity, however, to

once again admonish the Medical Commission that it is to base its decisions on the evidence presented and not its personal medical opinions.

## CONCLUSION

[¶ 38]  The Medical Commission failed to make required findings of basic facts on several critical issues.  The record and the Order are sufficient, however, to enable us to adequately review the final decision of the Medical Commission without overstepping our boundaries on review.

[¶ 39]  The record is clear that the decision denying benefits for Walton's low back is arbitrary and capricious.  No evidence supports a finding that Walton's low back has returned to pre-injury status.  The denial of benefits for continued treatment for Walton's low back injury is reversed.  We want to make clear that we have no comment as to the nature of any future treatment.

[¶ 40]  The denial of benefits for injuries to Walton's neck and left shoulder is affirmed.  Substantial evidence exists to support the finding that any injury to Walton's neck and left shoulder are not causally related to the work accident.  The denial is not arbitrary or capricious.

[¶ 41]  Walton makes no argument in her appellate brief that her migraine headaches are causally related to the work accident.  The denial of benefits for the medication for such headaches is summarily affirmed.

[¶ 42]  The order of the district court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.