# IN THE SUPREME COURT, STATE OF WYOMING

## 2013 WY 135

### OCTOBER TERM, A.D. 2013

### _October 24, 2013_

IN THE MATTER OF THE
WORKER'S COMPENSATION
CLAIM OF:

MARTY D. MCINTOSH,

Appellant
(Petitioner),

v.

STATE OF WYOMING ex rel.
WYOMING WORKERS' SAFETY
and COMPENSATION DIVISION,

Appellee
(Respondent).

S-13-0035

*Appeal from the District Court of Campbell County*
*The Honorable John R. Perry, Judge*

*Representing Appellant:*
>   Margaret M. White of Karpan & White, P.C., Cheyenne, Wyoming

*Representing Appellee:*
>   Gregory A. Phillips, Wyoming Attorney General; John D. Rossetti, Deputy Attorney General; Michael J. Finn, Senior Assistant Attorney General; Kelly Roseberry, Assistant Attorney General

*Before KITE, C.J., and HILL, VOIGT, BURKE, and DAVIS, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, Justice.

[¶1] Appellant Marty D. McIntosh worked as a roustabout for Kissack Oil Field Service in Gillette, Wyoming. He sustained a second to third-degree burn to his right foot while he was steam cleaning a pumping unit. His injury was determined to be compensable and he received a 5% impairment rating. He later experienced right foot pain and difficulty standing and wearing work boots, and he therefore applied for permanent total disability (PTD) benefits. His claim was referred to a panel of the Medical Commission ("the Panel" or "the Commission") for a contested case hearing.

[¶2] The Commission concluded that McIntosh did not meet his burden of proving entitlement to PTD benefits under the odd lot doctrine. The district court affirmed. We hold that the Commission reasonably concluded that McIntosh did not prove that he was entitled to permanent total disability benefits under the odd lot doctrine, and that it did not otherwise err in its decision. We therefore affirm.

## ISSUES

[¶3] The issues raised by this appeal are as follows:

> 1. Did the Commission adequately explain the rationale for its decision?
>
> 2. Does substantial evidence support the Commission's conclusion that McIntosh did not meet his burden of proving a prima facie case of odd lot treatment?
>
> 3. Did the Commission err in finding that McIntosh's preexisting conditions caused a significant portion of his symptoms?
>
> 4. Did the Commission err when it relied on the statements of two expert evaluators who suggested vocational rehabilitation?
>
> 5. Did the Commission act arbitrarily and capriciously because the Panel members examined McIntosh's right foot at the contested case hearing?

## FACTS

[¶4] McIntosh sustained a compensable injury to his right foot and ankle on August 11, 2006. He was working as a roustabout for Kissack Oil Field Service in the Gillette,

Wyoming area. He was steam cleaning a pumping unit when he accidentally aimed the steam gun at his right foot while climbing onto the unit. The steam penetrated his boot and burned his foot. McIntosh filed an injury report, and the Wyoming Workers' Safety and Compensation Division ("the Division") opened a case for treatment of his right foot and ankle.

[¶5] McIntosh was treated and returned to light duty work, but by November of 2006 his work boots began to cause blisters in the injured area. This led him to see Dr. Robert Neuwirth, a primary care physician in Gillette. Dr. Neuwirth reported "an eschar [dead tissue that falls off of healthy skin] which measures about 5 x 3 cm" and "a complex burn [that] may require skin grafting." He found no evidence of cellulitis (bacterial skin infection) or abnormal sensations in the lower extremities. He prescribed medication, and recommended that McIntosh stop working because he could not wear work boots as required by his job.

[¶6] Rapid City plastic surgeon Dr. Richard Carver performed a skin graft on McIntosh's right foot in December of 2006. By June of 2007, this graft began to break down, leading Dr. Carver to perform another graft in July of 2007. That graft is still in place.

[¶7] McIntosh began seeing primary care physician Dr. Farrukh Javaid for further burn and wound treatment in March of 2008. Dr. Javaid's initial physical examination indicated no swelling in the right foot, but he noted that McIntosh reported extensive pain and numbness in his legs and feet. Dr. Javaid believed the pain was "[m]ost likely . . . related to diabetic neuropathy [diabetes-related damage to nerves of the peripheral nervous system]," but that it could also be related to the burn and subsequent skin grafts. McIntosh returned to work in May of 2008, but continued to report persistent pain and swelling in his right foot, which was aggravated by standing and wearing work boots.

[¶8] Dr. Robert Finley, a Rapid City neurologist, performed a comprehensive neurological evaluation on McIntosh in August of 2008. A physical examination indicated normal reflexes and strength in the lower extremities, and normal neurological findings overall. An EMG/nerve conduction test indicated mild diabetic neuropathy. Dr. Finley believed that diabetic neuropathy contributed to the degree of pain McIntosh suffered in his lower extremities.

[¶9] McIntosh stopped working in December of 2008 when his long-time employer reluctantly discharged him because he was not able to report to work regularly. He continued to complain of persistent neuropathic pain while standing and walking. From late 2008 to early 2009, his treating physicians consistently attributed his complaints to peripheral neuropathy caused by diabetes as well as the work injury. However, Dr. Craig Mills, a pain management physician with Dr. Finley's practice, performed a physical

examination on November 19, 2008, and found good coordination, good muscle strength, and normal gait.

[¶10] In late 2009, McIntosh obtained impairment ratings from two independent physicians. Dr. Lawrence Splitter is a certified independent medical examiner from Billings, Montana. He reported a well-healed skin graft with maximum medical improvement, with a history of diabetes with peripheral neuropathy. He assigned a 5% whole body impairment rating and reported that McIntosh was capable of light duty work.

[¶11] Laramie pain management physician Dr. Michael Kaplan generally agreed with Dr. Splitter's impressions and conclusions, including the 5% impairment rating, but he also found some numbness in the area of the skin graft. Dr. Kaplan concluded that "[t]he patient has no motion restrictions at this time, but he is still symptomatic relevant to the sensations in the foot, with an intolerance for tight supportive shoewear and for sustained standing relevant to the foot and ankle." Dr. Kaplan believed that McIntosh could continue working in the oil fields, but only in a position in which he could avoid prolonged standing.[1]

[¶12] McIntosh continued to see Dr. Javaid for pain management and diabetic treatment. In February and March of 2010, Dr. Javaid charted swelling and increased pain in the right foot, which he concluded was likely related to both the work injury and diabetes. A compressive venous ultrasound was read as normal, but x-rays demonstrated subcutaneous soft tissue swelling and degenerative changes in McIntosh's right foot. In April and May of 2010, Dr. Javaid noted reduced swelling, but also recorded that McIntosh continued to have pain in his right foot. Dr. Javaid's notes from October and November 2010 indicated numbness in the area of the skin graft, but no significant swelling.

[¶13] McIntosh applied to the Division for permanent total disability benefits in September 2010. Dr. Javaid completed the PTD certification, in which he diagnosed neuropathy caused by a third-degree burn in the right foot, with pain, numbness, and swelling. According to the certification, McIntosh's pain was frequent enough to interfere with his attention and concentration, and his condition severely limited his ability to return to gainful employment. Dr. Javaid concluded that McIntosh could only stand for one hour in a work day, and that his impairments would produce "bad days" four to six days a week. Dr. Javaid believed that vocational training would help McIntosh obtain sedentary employment.

---

[1] The Court recognizes that sedentary oil field positions for which McIntosh would be qualified may be few and far between, if indeed any exist.

[¶14] The Division asked McIntosh to undergo an independent medical evaluation and a functional capacity evaluation, which he did. Gillette physical therapist Todd Gentzler performed the functional capacity evaluation[2] (FCE) in November of 2010. Mr. Gentzler reported an "outstanding" level of effort during strength and endurance testing, but also found that there were also some indicators of pain exaggeration and "inappropriate illness behavior."

[¶15] Mr. Gentzler concluded that McIntosh was capable of returning to work:

> The above results indicate Mr. McIntosh qualifies to work at the HEAVY work classification consistently over the course of two day[s] while doing an FCE. His biggest limiting factor is his back, the weakness and increased back pain that he suffers from. He was fused approximately 8 years ago, however he has never done any kind of rehab or anything of this nature to improve his status. . . . He gave a valid effort both days and his heart rate criteria exceeded the expectations indicating this. I feel that Mr. McIntosh with more training or DVR would be more beneficial for his success in the work force.

However, Mr. Gentzler also found that "it would be safer for him and he would have [a] higher success rate if he worked at the MEDIUM work classification for a while until he got used to the heavier work class."

[¶16] Dr. Anne MacGuire, a Casper rheumatologist, performed the independent medical evaluation (IME) in February of 2011. Her report indicated that McIntosh was able to sit, stand, and walk about the examination room without difficulty, but that he was not able to squat to more than 80% due to stiffness. Calf measurements on the right and left were

---

[2] The Division's regulations explain the scope and purpose of a functional capacity evaluation:

> A functional capacity evaluation can be requested by the Division, the health care provider, or the employer to measure general residual functional capacity to perform work or provide other general evaluation information, including musculoskeletal evaluation. The functional capacity evaluation must be performed by a licensed physical therapist or occupational therapist credentialed or experienced in performing functional capacity evaluations, or a licensed medical doctor who practices rehabilitation medicine or physiatry and is credentialed or experienced in performing functional capacity evaluations. The functional capacity evaluation must have objective components which measure the validity of the test results.

Dep't of Workforce Servs., Workers' Comp. Div. Rules & Regs, Ch. 10, § 11 (June 6, 2011).

equal, and there was no evidence of pain exaggeration or symptom magnification. Dr. MacGuire also reviewed all of McIntosh's injury-related medical records to the date of her examination.

[¶17] She found that McIntosh was not totally and permanently disabled because of the work injury:

> This individual sustained a 2 x 1 cm full-thickness burn to the lateral aspect of his right ankle. This by no mean[s] permanently impairs him. He does have other medical issues that in my mind make it difficult for him to return to roughnecking specifically the blindness in the left eye, loss of a finger, back surgery, and ongoing diabetes. . . .

> . . .

> This injury by itself should not in any way affect his ability to return to full and active duty as a roustabout. However, his diabetes I believe is the largest issue.

> It is my recommendation this individual change occupation and finds [sic] something where he is not at risk for being burned. If he can work in an oil field in a situation where his extremities are not at risk for burns or other temperature changes then there would be no reason why he could not return to that type of work. I believe the diabetes is the single most important issue.

[¶18] Shortly after Dr. Maguire's evaluation was completed, the Division determined that McIntosh's condition did not meet the statutory definition of permanent total disability. *See* Wyo. Stat. Ann. § 27-14-102(a)(xvi) (LexisNexis 2011) ("'Permanent total disability' means the loss of use of the body as a whole or any permanent injury certified under W.S. 27-14-406, which permanently incapacitates the employee from performing work at any gainful occupation for which he is reasonably suited by experience or training."). McIntosh objected to the determination and timely requested a contested case hearing. The case was then referred to a panel of the Wyoming Medical Commission for hearing.

[¶19] In early December of 2011, before the hearing took place, McIntosh saw Dr. John Mansell, a Gillette pain management specialist. Dr. Mansell reported right foot pain with edema and "dusky" skin, reflex sympathetic dystrophy (symptoms including tenderness, swelling, and pain, as well as burning pain) of the lower limb, and peripheral vein insufficiency. A CT angiogram (fluoroscopic imaging of blood flow within arteries)

showed no vascular compromise of the right lower leg. The imaging study report reflected some swelling in the right lower leg and lateral left ankle, but there were no blood clots.

[¶20] McIntosh was also evaluated by a vocational expert in December of 2011 at the request of his attorney. Jerry Gravatt, M.A., a certified vocational rehabilitation counselor, noted that McIntosh was forty-six years old at the time, and that he had not completed high school. He also had a history of ADHD and low scores in general aptitude tests. Mr. Gravatt concluded that McIntosh would not be a candidate for formal educational programs. Most of his work history consisted of roustabout and other physically demanding positions in the oil fields, but Gravatt believed that he had acquired some transferrable skills from his work experience.

[¶21] Mr. Gravatt concluded that McIntosh was still capable of light to medium duty work. He conducted a labor market survey of suitable positions in the Gillette area, and concluded as follows:

> One job opening was listed that would fall within the transferable skills of Mr. McIntosh.
>
> - Welder, TSI [Tri-State Industries, Inc.] … Salary DOE
>
> .   .   .
>
> There are few employment opportunities listed which would fall within the qualifications and restrictions of Mr. McIntosh. Those that do exist require experience or education in areas which Mr. McIntosh does not have.
>
> .   .   .
>
> At the time of his injury, Mr. McIntosh was earning $16.00 per hour working as a roustabout pusher for Kissack Oil Field in Gillette, Wyoming. In order to find him a position with comparable salary, some sort of on-the-job training program in a benchwork-type position would be suitable. In this capacity, he would be able to sit/stand as tolerated and work within his qualifications/restrictions.

As his attorney points out in her brief, McIntosh had no training or certifications as a welder, although he had worked in a welding shop.

[¶22] A contested case hearing took place in Cheyenne on February 1, 2012. The only issue was whether McIntosh was entitled to permanent total disability benefits under the odd lot doctrine, which is discussed in more detail below. One of the physicians on the panel was present in Cheyenne, while the other two attended by videoconference from Sheridan and Cody.

[¶23] McIntosh testified at the hearing that he dropped out of high school in the 11th grade, and that he worked in the oil fields and coal mines for approximately two decades. He has impaired vision in his left eye, and he lost a portion of his left index finger in a childhood accident. He underwent a lumbar fusion to alleviate back pain in 2001 or 2002. He returned to work after the surgery, but he still experienced some pain in his lower back, especially after bending and lifting.

[¶24] McIntosh indicated that he was diagnosed with diabetes in 2001, and that he is insulin-dependent. However, he also told the Panel that he was able to work full-time without foot problems until he was burned in 2006. He testified that his only diabetes-related problem before the injury was an occasional elevated blood sugar level.

[¶25] McIntosh testified that he experiences intermittent pain and swelling in his right foot. He was unsure whether his diabetic neuropathic condition caused the pain and swelling. He indicated that his right foot sometimes swells to twice its usual size, and that the swelling prevents him from wearing work boots or even regular shoes and socks. He also experiences occasional swelling in his left foot. He does not use any kind of support hose to increase circulation in either foot, although his physicians have suggested that he do so.

[¶26] He told the Panel that he was not currently using any narcotic pain medication, and that he can lift heavy weights and drive. McIntosh testified that he has experience driving haul trucks at a coal mine and running excavators and front-end loaders. He believed that he could still drive a haul truck or operate an excavator with his limitations, but getting a job running a front-end loader would require seniority, which he would not have. He also testified that he had some experience working at a large welding company in Campbell County, but that he is not a certified welder. He believed that he could work at a welding shop in some capacity, and even indicated that he could work as a welder, but he did not contact any of the welding shops in Campbell County to apply for those kinds of jobs.

[¶27] On cross-examination, McIntosh admitted that he has not applied for any jobs since he stopped working in late 2008:

> Q. . . . [S]ince you last worked for Kissack . . . you haven't made any sort of job applications, have you?

7

A.     No, not really; no.

Q.     Okay. You haven't contacted employers about possible employment opportunities; is that correct?

A.     Excuse me?

Q.     You haven't contacted employers of any kind?

A.     I -- I did one . . . . It was Wal-Mart.

Q.     Okay. And when was that that you did that, Mr. McIntosh?

A.     It's been -- It's been probably a year, year-and-a-half ago.

Q.     Okay. How about Job Service? Are you signed up with the Job Service office in Gillette?

A.     No.

[¶28] The Panel issued a written final order denying PTD benefits and concluding as follows:

> 10.     McIntosh sustained a work injury to his right foot. McIntosh underwent medical treatment including two skin grafts. . . . The graft area in question is approximately the size of two postage stamps.  Impairment ratings were done by Drs. Kaplan and Splitter who found McIntosh had a 5% impairment rating, which is a relatively low rating.
>
> 11.     The Panel has concerns over the reported swelling and pain in the right foot.  Testimony from McIntosh and Ms. Cunningham was to the effect that McIntosh's right foot (and right lower leg) can swell to two times their normal size. Over the past two years McIntosh has seen numerous doctors and health care providers.  The examinations revealed that there was some swelling or a small amount of edema.  There has been no findings by any doctor of significant swelling for the last few years. . . .

8

12. McIntosh has symptoms, i.e., swelling and pain, in both the left and right lower extremities. From the medical evidence, the left lower extremity and likely a significant amount of his right lower extremity symptoms relate to diabetic neuropathy and venous insufficiency. . . .

. . .

14. Dr. MacGuire opined that McIntosh was not disabled and could work. . . . The Panel agrees McIntosh is not disabled. At best there was a limited impact on McIntosh's ability to work from the work accident. . . . **The Panel relies heavily on the Functional Capacity Evaluation which provides an objective assessment of an employee/claimant's work ability. . . . The evaluator found that McIntosh was not disabled and that he was capable of returning to work in a heavy or at least a medium job classification. McIntosh submitted a report from his own retained vocational evaluator. . . . The evaluator opined McIntosh could work in a light to medium physical demand level job. This evaluator also identified a welding job that could be done by McIntosh.** He also opined that an "on-the-job training program in a benchwork-type position would be suitable."

15. . . . From McIntosh's testimony he does some exercising, yard work, rides motorcycles, goes camping and goes fishing. McIntosh has a driver's license. He does not require narcotic pain medication which is not consistent with severe debilitating pain and tends to show his ability to manage any pain without narcotic pain medication. McIntosh was very articulate, personable, and likeable. Having the various jobs he has had over the years tends to show McIntosh has a good work ethic, and given the hours he had been working he was a hard worker. **He testified as to some work that he may be able to do in the Campbell County area.** These factors support the finding that McIntosh is not permanently totally disabled.

16. **The claim must separately be denied based on McIntosh's lack of effort to find work. McIntosh has not engaged in any job search since leaving the Employer in issue. He has not applied for a single job.** He has not

registered with Job Service. He has not looked into vocational retraining. . . . McIntosh has not engaged in reasonable efforts to find work and based on the evidence, it cannot be said that his efforts to find work would have been futile.

17. The Panel finds and concludes that McIntosh has not met his burden of proof that he is permanently totally disabled under the odd lot doctrine.

(Emphasis added.)

[¶29] McIntosh filed a motion for reconsideration, relying on *McMasters v. State of Wyoming ex rel. Wyoming Workers' Safety & Compensation Division*, 2012 WY 32, 271 P.3d 422, 438 (Wyo. 2012).[3] The Panel denied the motion. McIntosh petitioned the district court for review of the Panel's determination, which was affirmed. His appeal from the district court's decision was timely perfected.

## STANDARD OF REVIEW

[¶30] As we have often stated, we accord no special deference to the district court's decision and consider the case as if it came directly from the agency. *Decker v. State ex rel. Workers' Safety & Comp. Div.*, 2013 WY 75, ¶ 7, 303 P.3d 1134, 1136 (Wyo. 2013) (quoting *In re Jensen*, 2001 WY 51, ¶ 9, 24 P.3d 1133, 1136 (Wyo. 2001)). Wyoming Statute § 16-3-114 governs judicial review of administrative action. Wyo. Stat. Ann. § 16-3-114 (LexisNexis 2013); *see also* W.R.A.P. 12.09. We review an agency's conclusions of law de novo, and affirm only if its conclusions are in accordance with the law. § 16-3-114(c)(ii)(A); *Stallman v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 28, ¶ 27, 297 P.3d 82, 89–90 (Wyo. 2013) (quoting *Moss v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2010 WY 66, ¶¶ 9–11, 232 P.3d 1, 4 (Wyo. 2010)). We review an agency's findings of fact arising from a contested case hearing for substantial evidence, which means "relevant evidence that a reasonable mind might accept as adequate to rationally support the hearing examiner's conclusion." § 16-3-114(c)(ii)(E); *Leavitt v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2013 WY 95, ¶ 32, 307 P.3d 835, 842 (Wyo. 2013).

[¶31] We also use the arbitrary and capricious standard of review as a "safety net" to catch agency action "which prejudices a party's substantial rights or which may be contrary to the other review standards under the Administrative Procedure Act, yet is not easily categorized or fit to any one particular standard." *Jacobs v. State ex rel. Wyo.*

---

[3] *McMasters* was published one day after the Commission entered its final order in this case. It is discussed below.

10

*Workers' Safety & Comp. Div.*, 2013 WY 62, ¶ 9, 301 P.3d 137, 141 (Wyo. 2013) (citing *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 23, 188 P.3d 554, 561 (Wyo. 2008)); *see* § 16-3-114(c)(ii)(A). This standard is not meant to apply to true evidentiary questions, but it instead applies when, for example, the agency "failed to admit testimony or other evidence that was clearly admissible, or failed to provide appropriate findings of fact or conclusions of law." *Jacobs*, ¶ 9, 301 P.3d at 141; *Dale*, ¶ 23, 188 P.3d at 561. This standard also applies when a medical hearing panel takes notice of contested material facts that are not in evidence. *Worker's Comp. Claim of Rodgers v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2006 WY 65, ¶ 41, 135 P.3d 568, 582 (Wyo. 2006); *Decker v. State ex rel. Wyo. Med. Comm'n*, 2005 WY 160, ¶ 33–34, 124 P.3d 686, 696–97 (Wyo. 2005).

## DISCUSSION

[¶32] The odd lot doctrine is a special rule for determining entitlement to permanent total disability benefits under certain circumstances. *Stallman,* ¶ 31, 297 P.3d at 90–91. It allows permanent total disability benefits for "workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well known branch of the labor market." *Id.* (quoting *Moss*, ¶ 13, 232 P.3d at 5). In other words, "a claimant who is not actually permanently totally disabled is able to receive permanent total disability benefits because the claimant's disability and other factors make the claimant *de facto* unemployable." *In re Pickens*, 2006 WY 54, ¶ 14, 134 P.3d 1231, 1236 (Wyo. 2006).

[¶33] The odd lot doctrine requires the following burden-shifting approach:

> To be entitled to an award of benefits under the odd lot doctrine, an employee must prove: 1) he is no longer capable of performing the job he had at the time of his injury and 2) the degree of his physical impairment coupled with other factors such as his mental capacity, education, training and age make him eligible for PTD benefits even though he is not totally incapacitated. **To satisfy this burden, an employee must also demonstrate he made reasonable efforts to find work in his community after reaching maximum medical improvement or, alternatively, that he was so completely disabled by his work-related injury that any effort to find employment would have been futile.** If the employee meets his burden, the employer must then prove that light work of a special nature which the employee could perform but which is not generally available in fact is available to the employee.

11

*Stallman*, ¶ 32, 297 P.3d at 91 (quoting *Moss*, ¶ 14, 232 P.3d at 5) (emphasis added); *see also, e.g.*, *McMasters*, ¶¶ 61–65, 271 P.3d at 437–38; *In re Nagle*, 2008 WY 99, ¶ 11, 190 P.3d 159, 164–66 (Wyo. 2008) (quoting *Vaughan v. State ex rel. Workers' Comp. Div.*, 2002 WY 131, ¶¶ 8–12, 53 P.3d 559, 562–63 (Wyo. 2002)); *Pickens*, ¶ 14, 134 P.3d at 1236; *Schepanovich v. U.S. Steel Corp.*, 669 P.2d 522, 525 (Wyo. 1983); *In re Iles*, 56 Wyo. 443, 451–53, 110 P.2d 826, 829 (1941); 4 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 83 (2013).

[¶34] The question of whether an injured worker has made a prima facie showing of odd lot treatment is normally a question of fact. *Stallman*, ¶ 27, 297 P.3d at 89 (quoting *Moss*, ¶ 11, 232 P.3d at 4). When an agency has found that a claimant has not carried his burden of proof, we review the record as a whole to determine whether it contains relevant evidence that a reasonable mind might accept as adequate to rationally support its conclusion. *Leavitt*, ¶ 32, 307 P.3d at 842 (citations omitted). In other words, "this Court must be able to conclude that the agency decision was not contrary to the overwhelming weight of the record evidence as a whole." *Id.* (citations omitted).

[¶35] There is no real dispute that McIntosh was incapable of returning to work as a roustabout. The Panel's decision rested instead on the second prong of the odd lot doctrine, because it found that McIntosh had failed to demonstrate a prima facie case of de facto unemployability. McIntosh contends that he made the required prima facie showing, and that the burden should therefore have shifted to the Division to demonstrate that light work he could perform was in fact available. He claims that he has severe physical limitations because he cannot sit or stand for lengthy periods, and that he has few employment opportunities because he is 47 years old with nearly 25 years of experience in physically demanding jobs. He also notes that he never finished high school, and he would not therefore be a realistic candidate for office work or educational programs.

[¶36] McIntosh did not look for work after losing his job with Kissack Oil Field Service. He testified that he contacted Wal-Mart in 2010 or 2011, but he did not claim that he applied for a job. He also admitted that he had not registered with "Job Service" in Gillette, and that he did not contact any of the welding shops or coal mines where he thought he might be able to find work. The Panel therefore had a reasonable basis to find that McIntosh did not engage in reasonable efforts to find work.[4]

---

[4] *See, e.g.*, *Stallman*, ¶ 38, 297 P.3d at 93 (suggesting that claimant engaged in a reasonable work search because she contacted over thirty employers in a small community, although none were actually hiring); *Nagle*, ¶ 16, 190 P.3d at 166 (suggesting that claimant engaged in a reasonable work search where he looked for work "in a manner consistent with his experience as a laboring man, i.e., he called on employers in person to see if they had work available"); *Anaya v. Holly Sugar Corp.*, 928 P.2d 473, 476 (Wyo. 1996) (no reasonable efforts to secure employment where claimant considered himself retired after his work injury and did not look for any jobs).

[¶37]   McIntosh might have met his burden if he had shown that a search for work would have been futile due to his physical limitations, lack of education, limited work experience, and other factors.  However, Drs. MacGuire, Splitter, and Kaplan concluded that McIntosh was capable of returning to work with some limitations. The functional capacity evaluator concluded that McIntosh was even capable of heavy-duty work, although he cautioned that medium-duty positions would be more appropriate given his physical limitations.  McIntosh's own vocational expert also reported that he could work in a medium-duty job, and suggested a potential position at a nearby welding shop.  Dr. Javaid was the only expert who indicated that McIntosh was only capable of sedentary or light-duty employment.

[¶38]   The Wyoming Legislature established the Medical Commission with the implicit recognition that "many contested claims involve complex medical issues." *French v. Amax Coal W.*, 960 P.2d 1023, 1030 (Wyo. 1998).  When presented with expert medical testimony, the Commission, "as the trier of fact, is responsible for determining relevancy, assigning probative value, and ascribing the relevant weight to be given to the testimony." *Decker*, ¶ 33, 124 P.3d at 697 (quoting *Baxter v. Sinclair Oil Corp.*, 2004 WY 138, ¶ 9, 100 P.3d 427, 431 (Wyo. 2004)); *see also Nagle*, ¶ 15, 190 P.3d at 166 (commission must apply its fact-finding expertise in accordance with governing law). If the Commission had a reasonable basis for concluding as it did, this Court does not "invade the province of the trier of fact by reaching a different conclusion on appeal." *See Schepanovich*, 669 P.2d at 529 (citations omitted).

[¶39]   The Commission could reasonably have concluded as it did that McIntosh failed to prove that a search for employment would have been futile on this record.  Simply put, McIntosh did not prove that he was the "odd lot man," whose "request for employment . . . is quickly put aside for more versatile competitors." *See Jordan v. Decorative Co.*, 130 N.E. 634, 636 (N.Y. 1921) (citations omitted) (internal quotation marks omitted).

[¶40]   McIntosh also contends that the Panel "leaped" past the prima facie determination, claiming that "[n]owhere in its Findings of Fact or Conclusions of Law did the [Panel] address the issue of whether Mr. McIntosh had made a showing sufficient to establish a prima facie case and to shift the burden described above to the Division."

[¶41]   Wyoming Statute § 16-3-110 requires a final decision or order adverse to a party in a contested administrative case to include "findings of fact and conclusions of law separately stated."  Wyo. Stat. Ann. § 16-3-110 (LexisNexis 2013).  The findings of fact, "if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings."  *Id.*  This section requires a hearing examiner (or Medical Commission hearing panel) "to make findings of basic facts upon all material issues and upon which his ultimate findings of fact or conclusions are based."  *Shepherd of Valley Care Ctr. v. Fulmer*, 2012 WY 12, ¶ 27, 269 P.3d 432, 440 (Wyo. 2012) (citation omitted); *see also, e.g.*, *Exxon Mobil Corp. v. Wyo. Oil & Gas*

*Conservation Comm'n*, 2013 WY 32, ¶ 34, 297 P.3d 782, 791 (Wyo. 2013) (remanding a formal adjudication of the Wyoming Oil and Gas Conservation Commission for factual findings sufficiently detailed to permit judicial review); *Decker*, ¶ 36, 124 P.3d at 697 (vacating an order following a contested worker's compensation case hearing because the commission hearing panel did not adequately explain its decision).

[¶42] The Panel correctly stated the controlling principles of law under the odd lot doctrine, and properly recognized that McIntosh carried the initial burden of proving *de facto* unemployability, which he did not do because he made no effort to find a job. It concluded that a skin graft "the size of two postage stamps," when combined with other factors, would not have rendered such efforts futile. The Panel engaged in a careful, lengthy analysis of McIntosh's condition and the various evaluations of his potential employability, and its findings adequately explain the basis for its decision.

### Pre-Existing Conditions

[¶43] McIntosh contends that the Commission erred when it concluded that "likely a significant amount of his right lower extremity symptoms relate to diabetic neuropathy and venous insufficiency." He claims that he made at least a prima facie showing that his workplace injury played a significant role in his disability. He also argues that the medical evaluators failed to take his preexisting conditions into account, and that the Commission failed to recognize the general principle that a work-related injury does not have to be the primary cause of a disability.

[¶44] We agree that "in Wyoming an employer takes the employee as he finds him." *Lindbloom v. Teton Int'l*, 684 P.2d 1388, 1389 (Wyo. 1984). As we have said:

> [A]n employee's right to worker's compensation benefits does not depend on the employee's condition or health or on his freedom from a susceptibility to injury due to constitutional weakness or latent tendency, but instead on the hazard of the employment acting on the particular employee in his then state of health.
>
> .  .  .
>
> The odd lot doctrine is consistent with this premise in its provision for benefits when a claimant's work injury combined with some other factor, such as mental capacity, renders the claimant unemployable.

*McMasters*, ¶¶ 81–82, 271 P.3d at 441 (citations omitted). *See also* 1 Larson, *supra*, at § 4-1 ("When employment and personal risks concur to produce injury, the injury arises out

14

of the employment, since the employment need not be the primary cause, but need only contribute to the injury.").

[¶45] The expert evaluators in this case did account for McIntosh's preexisting conditions when they assessed his physical limitations. Mr. Gentzler conducted two days of strength and endurance testing, determined that McIntosh's biggest limiting factor was back pain, but still found him capable of heavy-duty work. Dr. MacGuire likewise reported problems with back pain and diabetes, but ultimately concluded that McIntosh was not permanently and totally disabled. Dr. Splitter also noted a history of diabetes with peripheral neuropathy, but still believed McIntosh was capable of light duty work.

[¶46] Given these evaluations, the Commission did not err in finding that "[t]here are other unrelated medical issues that potentially impact McIntosh's ability to engage in certain employment." It simply took all of his documented conditions into account, just as the expert evaluators did, and concluded that he failed to demonstrate that he had looked for work or that any search would have been futile. Substantial evidence supports the Commission's findings, and it did not otherwise err as a matter of law.

### *Vocational Retraining*

[¶47] McIntosh further attacks the expert opinions of Dr. MacGuire and Mr. Gravatt because they stated that McIntosh could benefit from vocational retraining. He contends that the Commission improperly relied on these statements, and notes that the odd lot doctrine does not require an injured employee to retrain. As McIntosh points out, we recently held that the odd lot doctrine "does not encompass any obligation on the part of the injured employee to enter into any training program in order to improve his chances of employment." *McMasters*, ¶ 88, 271 P.3d at 443.

[¶48] The expert evaluators' statements regarding vocational retraining must be taken in context. Dr. MacGuire did not say that McIntosh could not return to work *unless* he enrolled in a vocational retraining program. She simply thought vocational retraining might be an option. Mr. Gravatt indicated that "[t]here are few employment opportunities listed which would fall within the qualifications and restrictions of Mr. McIntosh," but he was able to locate a suitable position at a welding shop. He did not indicate that vocational retraining was the *only* option, and in fact stated that McIntosh would not be a likely candidate for a formal educational program.

[¶49] The Commission did not find or otherwise imply that McIntosh was not entitled to odd lot total disability because he could undergo vocational training. It considered the various expert opinions, and ultimately concluded that McIntosh had not proven that he was entitled to odd lot treatment for reasons already stated. It had a reasonable basis to conclude as it did, and did not err in its application of the odd lot doctrine based on comments concerning vocational training.

***Commission's Observations of McIntosh***

[¶50]  McIntosh also takes issue with some of the observations the Panel made during the hearing and commented upon in its order.  The final order includes the following observations:

> While McIntosh's time before the Panel at the hearing is but a snapshot of time, he did not appear in pain, was able to sit comfortably, move comfortably, and walk normally. There was minimal foot swelling.
>
> .   .   .
>
> The Panel observed McIntosh was able to sit comfortably, move from sitting to standing and standing to sitting comfortably. He was able to walk well with no problems.

McIntosh claims that the Panel acted arbitrarily and capriciously when it relied on its own evaluations in its overall assessment of the expert medical opinions in this case.

[¶51]  This Court has repeatedly "cautioned the Commission against . . . impromptu medical diagnoses and reminded the Commission of its obligation to make its decision on the basis of the records and testimony entered into evidence." *McMasters*, ¶ 77, 271 P.3d at 441 (citing *Moss*, ¶ 30, 232 P.3d at 9; *Nagle*, ¶ 17, 190 P.3d at 166–67; *Rodgers*, ¶ 41, 135 P.3d at 582; *Decker*, ¶ 34, 124 P.3d at 697).  In *McMasters*, we discussed some of the problems that result from any firsthand observations of a claimant's medical condition:

> The final basis the Commission offered as a reason to find McMasters lacked credibility was its observation that McMasters seemed to sit without apparent distress during the hearing, contrary to the limitations on sitting that he had reported to Dr. Davis. . . .
>
> The hearing was held via videoconference with panel members in Cheyenne and Sheridan, and McMasters and his attorney in Casper.  It is difficult to understand, given the lack of proximity, how the panel members could clearly ascertain McMasters' distress or lack thereof.  Additionally, we know from McMasters' testimony that he was using a TENS unit to alleviate pain during the hearing, which may be one reason he was able to sit for longer.  Or perhaps the stress of the hearing

16

was overriding the stress of the pain, or maybe he was having a good day, or maybe McMasters took days to recover from the hearing. We just do not know, and **it is all of these unanswered questions that make these types of observations largely irrelevant. They simply provide very little helpful information and are a particularly flimsy basis for rejecting credibility.**

*McMasters*, ¶¶ 77–78, 271 P.3d at 440–41 (emphasis added). However, as we have recently noted, even findings which are incorrect do not require reversal of a hearing examiner's decision if the record as a whole supports that decision. *Leavitt*, ¶¶ 33–34, 307 P.3d at 842.

[¶52] The Panel's decision commented on the appearance of McIntosh's injured foot. Panel members are not allowed to rely on their personal expertise to diagnose a claimant's condition. *Walton v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2007 WY 46, ¶ 37, 153 P.3d 932, 940–41 (Wyo. 2007) (citations omitted). They should not therefore engage in *sua sponte* examinations of a claimant. *See, e.g.*, Wyo. Stat. Ann. § 16-3-111 (LexisNexis 2013) (persons that have taken part in the investigation of a contested administrative case cannot participate or advise in the decision except as counsel or a witness in public proceedings); *McMasters, supra*; Dep't of Workforce Servs., Medical Comm'n Rules & Regs., Ch. 10, § 3 (Feb. 14, 2003) (Medical Commission's finding should be based on the evidence in the record, although the hearing panel members may use their expertise in evaluating the evidence).

[¶53] However, in this case, McIntosh's counsel asked the members of the Panel to look at his injured foot:

> **[MCINTOSH'S COUNSEL]: Okay. At this time I would like Mr. McIntosh to show the panel the actual wound instead of relying on the description.**
>
> THE HEARING OFFICER: That's fine.
>
> [MCINTOSH'S COUNSEL]: Mr. McIntosh, if you would remove -- and I don't know how we are doing to do this.
>
> THE HEARING OFFICER: Take off both of your shoes and socks so we can compare right to left.
>
> [MCINTOSH'S COUNSEL]: Okay.

**THE HEARING OFFICER: And those panel members appearing by video, I will do my best to zoom the camera in on his feet. And we may –**

**[MCINTOSH'S COUNSEL]: Oh, really, can you do that?**

THE HEARING OFFICER: To some extent, we'll play with it a little bit [talks about adjusting the camera].

. . .

[MCINTOSH'S COUNSEL]: Now, unfortunately, the burn's on the other side. Can the doctors see this? [more camera adjustments take place]

. . .

**[MCINTOSH'S COUNSEL]: Okay. Can you see the wound?**

DR. BALISON: I could see it. . . . Dr. Shafer [who is at the hearing in person], what are the dimensions of that full thickness skin graft?

DR. SHAFER: About two-and-a-half by five centimeters. . . . I think there's some scarring around it. . . . There's no color/ discoloration of the foot, particularly, except over the area of the burn.

DR. BALISON: And is there pitting edema?

DR. SHAFER: May I touch you?

THE WITNESS: Sure.

DR. SHAFER: There's no pretibial edema . . . . No, there's no pitting.

. . .

[MCINTOSH'S COUNSEL]: Dr. Finley, do you have any questions? [some confusion follows about who she was addressing]

18

. . .

> DR. FINLEY: I could see well. I have no questions. Thank you.

(Emphasis added.)

[¶54] "As a general rule, parties are bound by the theories they advanced below." *Mayland v. Flitner*, 2001 WY 69, ¶ 44, 28 P.3d 838, 853 (Wyo. 2001) (citing *Ricci v. New Hampshire Ins. Co.*, 721 P.2d 1081, 1088 (Wyo. 1986)). The doctrine of invited error "prohibits a party from raising on appeal alleged trial court errors that were induced by that party's actions." *Butcher v. State*, 2005 WY 146, ¶ 29, 123 P.3d 543, 552 (Wyo. 2005) (citations omitted); *see also Pac. Power & Light v. Heermann*, 872 P.2d 1171, 1174 (Wyo. 1994) (invited error in the administrative context). Generally speaking, the party complaining of error must have "solicited or otherwise acted affirmatively for the invited error doctrine to apply." *Bromley v. State*, 2007 WY 20, ¶ 26, 150 P.3d 1202, 1211 (Wyo. 2007) (quoting *James v. State*, 998 P.2d 389, 393 (Wyo. 2000)).

[¶55] McIntosh's counsel invited the panel to look at his foot, and he now complains of that very conduct on appeal. It is unclear what, if any, level of professional expertise the panel members used to evaluate what they had seen, or the effect of their observations on their decision. In any event, the fact that they did as requested does not constitute reversible error. If we were to hold otherwise, it might encourage similarly situated litigants to make "an affirmative, apparently strategic decision at trial and then complain on appeal that the result of that decision constitutes reversible error." *United States v. Jernigan*, 341 F.3d 1273, 1290 (11th Cir. 2003).

[¶56] There was substantial evidence to support the Panel's decision. We have already discussed that evidence in detail.

## CONCLUSION

[¶57] The Medical Commission reasonably concluded that McIntosh did not demonstrate entitlement to permanent total disability benefits under the odd lot doctrine, and its conclusions were not contrary to applicable law, arbitrary or capricious. Affirmed.